

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00009-CV
_____

WILLIAM R. AND SUSAN M. KNODERER, Appellants

V.

STATE FARM LLOYDS, PENNI PERKINS, AND TOM ROBERTS, Appellees

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 74,037

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

O P I N I O N

On February 20, 2008, William R. and Susan N. Knoderer's home sustained extensive water damage resulting from the separation of a water pipe from its fitting. In the first appeal of this case, this Court reversed the trial court's death penalty sanctions assessed against the Knoderers and remanded the cause for further proceedings. *Knoderer v. State Farm Lloyds* (*Knoderer I*), No. 06-13-00027-CV, 2014 WL 4699136 (Tex. App.—Texarkana Sept. 19, 2014, no pet.) (mem. op.). On remand, the trial court assessed lesser sanctions against William in the amount of $333,157.57, being the attorney fees, expert fees, and costs incurred by State Farm Lloyds related to William's sanctionable actions. Thereafter, a lengthy jury trial ensued on the Knoderers' misrepresentation claim against State Farm and Tom Roberts brought pursuant to the Insurance Code.[1] A Hunt County jury found that neither State Farm nor Roberts[2] made any misrepresentations relating to an insurance policy; that at least one of the Knoderers procured, caused, or contributed to the loss; that at least one of the Knoderers intentionally concealed or misrepresented a material fact relating to the insurance policy; and that at least one of the Knoderers committed fraud against State Farm. After a post-verdict hearing on State Farm's counterclaim under Section 541.153 of the Insurance Code,[3] the trial court entered a take-nothing judgment against the Knoderers on their claims against State Farm, awarded State Farm an

---

[1]*See* TEX. INS. CODE ANN. §§ 541.061, 541.151 (West 2009), § 541.152 (West Supp. 2016).

[2]Hereinafter, State Farm and Roberts will be referred to collectively as "State Farm," and Roberts will only be identified individually when required by the context.

[3]*See* TEX. INS. CODE ANN. § 541.153 (West 2009).

additional $353,036.75 in attorney fees under Section 541.153, reaffirmed its order awarding lesser sanctions, and awarded State Farm appellate attorney fees and costs of court.

In this appeal, the Knoderers assert that the trial court erred (1) in assessing monetary sanctions; (2) in awarding attorney fees under Section 541.153; (3) in allowing the jury to hear evidence relating to the Knoderer's spoliation of evidence and in submitting a spoliation instruction; (4) in submitting erroneous jury instructions and questions; and (5) in allowing State Farm's expert, Antoine Rios, to testify because his actions allegedly violated the Texas Private Security Act. We find (1) that the trial court did not abuse its discretion in assessing monetary sanctions, (2) that the trial court erred in admitting spoliation evidence and in submitting a spoliation instruction, but that the error was harmless, (3) that any error in the jury charge was harmless, and (4) that the trial court erred in awarding attorney fees under Section 541.153. We also find that the complaint regarding the admission of Rios' testimony was not preserved. Therefore, we will reverse the trial court's award of attorney fees under Section 541.153, but we will affirm the remainder of its judgment.

## I.     Background

In April 2007, a copper pipe under the foundation of the Knoderers' house began to leak. Tyson Hobbs of H & R Plumbing isolated the leak and rerouted the plumbing to avoid the leaking pipe. Hobbs used a flexible polyethylene piping called PEX to reroute the water from a plumbing manifold located behind a wall in the utility closet. He also used a metal fitting, called a SharkBite fitting, to connect the PEX pipe to the existing plumbing. The SharkBite fitting gets its name from a ring of metal teeth that bites into the PEX pipe when it is inserted into the fitting that is designed

3

to prevent the pipe from pulling back out when pressure is applied to the line. In order to access the manifold, Tyson cut out a piece of the drywall, which was later replaced and repaired by Randy Wineinger. About ten months later, the PEX pipe separated from the fitting, resulting in the inundation of the first floor of the Knoderers' house with an inch or more of water. This lawsuit arose out of certain representations made by State Farm during its handling of the Knoderers' water damage claim and State Farm's subsequent denial of the claim based on its contentions that the Knoderers intentionally caused the loss and that the Knoderers intentionally concealed or misrepresented one or more material facts or circumstances relating to the loss.

As we noted in *Knoderer I*, this is not the first dispute between the Knoderers and State Farm. *Id.* at *1. In 2003, the Knoderers had had a prior water leak in the same house, which also flooded the first floor of the house. State Farm was also the Knoderers' insurer at that time and spent approximately $252,000 to restore the house. During the restoration, the Knoderers saw what they thought was mold behind the walls and wanted State Farm to remediate it. Apparently, the Knoderers did not have mold coverage at the time, and State Farm refused to resolve the issue to their satisfaction. Although William testified at the trial of this lawsuit that the issue could have been resolved for $40,000, after the claim was closed, the Knoderers demanded that State Farm pay them $3,000,000. The Knoderers filed suit against State Farm claiming the mold was caused by the failure of State Farm to properly dry the house (First Lawsuit). The trial of the First Lawsuit took place on January 8–10, 2008. At that trial, William testified that the house had significant mold and that the house was uninhabitable for their personal use. He also testified that it had given him a medical condition that impaired his cognitive memory. Nevertheless, the jury returned a

4

verdict in favor of State Farm. William testified that he spent approximately $400,000 in attorney fees in the First Lawsuit.

Six days after the verdict in the First Lawsuit, on January 16, 2008, the Knoderers secured another policy from their State Farm agent which included $900,000 for coverage in the event that mold was discovered in their home. Then, by letter dated January 30, 2008, State Farm advised the Knoderers that it would not be able to provide them mold coverage and that the mold coverage endorsement would cease on March 6, 2008. On February 20, 2008, the Knoderers' house was inundated with water a second time when the PEX pipe separated from its fitting.

By the morning of February 21, the Knoderers had contacted Servpro to begin removing the water and drying their house, H & R Plumbing to fix the leak, and State Farm to notify it of the claim. Tyson Hobbs of H & R Plumbing testified that when he came to the Knoderers' house, he found the PEX pipe separated from the Sharkbite fitting. To repair it, he removed the old fitting, cut some slack out of the pipe, put a new fitting on, reconnected it, and turned the water on to make sure it no longer leaked. He also testified that the fitting he took out was not broken and looked like a regular SharkBite fitting.

State Farm initially assigned the claim to Doug Taylor, who met with the Knoderers and Ronny Hobbs of H & R Plumbing on February 21. Taylor requested that Ronny provide him with the fitting that was removed from the Knoderers' house, as well as the piece of PEX pipe that it had been attached to. Although there was conflicting testimony regarding whether the fitting and PEX pipe given to Taylor were the ones removed from the Knoderers' house, Taylor understood that they were. Taylor explained that he obtained the parts for subrogation purposes if it was

5

determined that a part failed or that somebody else was at fault. On February 26, he sent the parts to Dr. Antoine Rios with The Madison Group.

Within two days of the loss, William began pointing out areas to Scott Mooney, the general manager of Servpro, where he was concerned there may be black mold. As a result, Taylor instructed Mooney to dry and remediate the house from a mold standpoint. On February 28, 2008, State Farm sent a reservation of rights letter advising the Knoderers that it was reserving its rights to deny coverage for any damage that was not caused by accident or that occurred outside the policy period, among other reasons.

On March 5, 2008, State Farm transferred the handling of the claim to Beckey Woodard with its Special Investigative Unit (SIU) due to possible fraud by the Knoderers. Woodard explained that the SIU is assigned claims when there are National Insurance Crime Bureau indicators. She said the indicator in this case was the new $900,000 mold endorsement that was in the process of being cancelled at the time of the loss. On March 12, Rios told State Farm that based on his initial findings, he could not pinpoint how the pipe had separated from the fitting, but that it was unlikely that it separated by water pressure alone; he asked to do more testing. On April 8, Roberts, a claim team manager for State Farm, authorized Rios to proceed with further testing to determine the cause of the failure of the PEX pipe and fitting connection.

Meanwhile, Servpro continued to dry the house, removing the floors and baseboards and cutting drywall in order to dry the slab. Woodard explained that State Farm could neither wait on the results of the subrogation investigation before drying the slab, nor deny the claim based on a suspicion of fraud. However, as State Farm authorized more drywall to be removed, as well as

6

counters and cabinets, the Knoderers became concerned that State Farm might deny the claim after these were removed. During March, April, and May 2008, Roberts, Woodard, and the Knoderers had a number of communications regarding the removal of the floors, walls, cabinets, and countertops. Among those communications were several letters to the Knoderers from Woodard and Roberts.

By letter dated April 2, 2008, Roberts, after discussing the findings of State Farm's hygienist regarding mold, the necessity of removing the hardwood floors and cabinetry, and other matters, stated:

> Beckey Woodard has informed me you are concerned that we may not pay for repair or replacement of cabinets damaged while being removed to access the subfloor under them. You are concerned that if mold of origin pre-dating February 20, 2008 is found, we will not pay for necessary repair or replacement of the cabinets. The cabinets are being removed as a necessary part of accessing the floor underneath, per CIH William Vining's recommendation. Should those cabinets be damaged during the removal process, regardless of mold found on them, State Farm Lloyds will pay the cost to repair or replace them. We do expect a contractor to exercise due diligence in removing the cabinets.

Then, by letter dated April 29, 2008, Woodard, responding to an email from and telephone conversations with the Knoderers, after explaining the necessity of removing the drywall, wrote:

> As we discussed over the phone, Bentwood already has all the information needed to replace the cabinets in your kitchen. Since the manufacturer has told us they can manufacture[] the cabinet toe boards to match, we need to consider the possibility of repairing the existing cabinets. If the cabinets need to be replaced, we will of course do so. However, we want to make sure the replacement is necessary.

> You also mentioned State Farm rescinding our question of coverage relating to damage that occurred outside the policy period. Please be advised State Farm is not rescinding this question of coverage. We continue to reserve our rights under the policy, as stated in our February 28, 2008 letter to you.

7

In responding to another email from the Knoderers, Woodard, by letter dated May 7, 2008, told the Knoderers, "With regards to the kitchen cabinets[,] since they were damaged (chipped) during removal, we intend to replace them." She also addressed other issues brought up in the email. Although State Farm had advised the Knoderers that there was a question regarding the accidental nature of the loss, it had not told the Knoderers they were being investigated for the possibility of fraud before the removal of the cabinets and drywall. Woodard testified that since no fraud had been determined at that point, the loss was being treated as an accidental loss. Woodard explained that the removal of the floors, drywall, and cabinets was necessary to dry out the house and slab.

Shortly after the removal of the floors, drywall, and cabinets was completed, State Farm received updated reports from Rios. On May 30, 2008, Woodard and Roberts had a telephone conference with Rios in which he told them that he was very confident that the failure of the PEX pipe was not accidental, but was caused by human manipulation of the collar. On June 2, 2008, State Farm sent the Knoderers a second reservation of rights letter, enclosed Rios' report, and advised them that if the investigation determined that the loss was caused by them or at their direction, then the proceeds of the policy would not be paid. The letter also set forth policy provisions voiding coverage for intentional acts by the insured and for concealment or fraud by the insured.

After additional investigation, State Farm determined that the Knoderers had intentionally caused the loss. By letter dated March 13, 2009, State Farm notified the Knoderers that it had determined that they had intentionally caused the loss and that they had violated the intentional acts by the insured and the concealment or fraud by the insured provisions of the policy, that the

8

policy was void, and that State Farm would no longer pay any amounts under the policy for the loss.[4] At the time of trial, the house apparently remained in the same condition it was in after removal of the floors, walls, counters, and cabinets.

The Knoderers filed this lawsuit claiming that they were damaged by State Farm's representations in its April and May letters that it would pay to restore the house to the condition it was in before the removal of the floors, walls, counters, and cabinets. The Knoderers' cause of action was based on Section 541.061 of the Insurance Code, which provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by:
>
> (1)     making an untrue statement of material fact;
>
> . . . .
>
> (3)     making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact . . . .

TEX. INS. CODE ANN. § 541.061. State Farm asserted defenses, *inter alia*, based on the Knoderers' breach of the intentional acts by the insured[5] and the concealment or fraud by the insured[6]

---

[4]It is undisputed that State Farm paid over $300,000 under the claim for removal of the floors, walls, and cabinets; drying out the house; personal property coverage; and additional living expenses of the Knoderers before denying the claim.

[5]This provision provides:

> Intentional Acts. If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void as to you and any other insured that caused or contributed to the loss or its procurement.

[6]This provision provides:

> Concealment or Fraud. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

9

provisions of their policy and for common law fraud. The jury returned a unanimous verdict finding all issues in favor of State Farm. The Knoderers do not challenge the factual or legal sufficiency of the evidence supporting the jury's verdict.

## II.     No Abuse of Discretion in Awarding Lesser Monetary Sanctions

In *Knoderer I*, we reversed the trial court's judgment, deleted all sanctions against Susan, and remanded the case to the trial court for further proceedings, "including, at the discretion of the trial court, an assessment of other lesser sanctions against William." *Knoderer I*, 2014 WL 4699136, at *16. The evidence before the trial court supporting an award of sanctions, as well as the procedural history relating to the sanctionable conduct of William, is fully set forth in *Knoderer I*.[7] *See id.* at *1–5. On remand, State Farm filed a motion for lesser sanctions against William, and the trial court, after hearing evidence of the attorney fees, expert witness fees, and costs incurred by State Farm related solely to the sanctionable conduct and the resulting investigations and hearings, assessed sanctions against William for those attorney fees, expert fees, and costs in the total amount of $333,157.57. In their first point of error, the Knoderers contend that the trial court erred in assessing lesser monetary sanctions against William.

---

[7]The evidence showed that William, in an attempt to discredit the testimony of State Farm's expert, Rios, produced six photographs that he claimed were photographs of the faulty fitting taken from his house ("the fabricated photographs"). He then used those photographs in support of a motion to exclude Rios' testimony. The evidence also showed that William resisted producing the fabricated photographs in a digital format that would allow State Farm to determine when the photographs were taken. Eventually, William produced the fabricated photographs in a digital format that contained metadata indicating they were taken the morning after the leak. *Knoderer I*, 2014 WL 4699136, at *4. After another State Farm expert testified that he believed the metadata had been altered, the trial court eventually ordered William to produce any hard drives and storage devices containing the photographs without altering them in any way. However, even after the court's order, someone (apparently William) caused multiple programs to be repeatedly run on his computer which deleted and overwrote the files—including photographs—and registry files on the computer. *Id.* at *5.

## A. Standard of Review

"We review a trial court's ruling on a motion for sanctions for an abuse of discretion." *Id.* at \*6 (citing *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004)). We will reverse the trial court's ruling only if it "acted 'without reference to any guiding rules and principles,' such that its ruling was arbitrary or unreasonable." *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam) (quoting *Cire*, 134 S.W.3d at 839). In determining whether the trial court abused its discretion, we conduct a two-part inquiry. *Id.* First, we "ensure that there is a direct relationship between the improper conduct and the sanction imposed." *Id.* (citing *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991)). In this part, we examine whether the trial court imposed the sanctions on the "true offender" and whether the sanctions were "tailored to remedy any prejudice [the] discovery abuse caused." *Id.* (citing *Powell*, 811 S.W.2d at 917). Second, we determine whether the sanction is excessive, i.e., whether less severe available sanctions would have been sufficient to fully promote compliance. *See id.*; *Knoderer I*, 2014 WL 4699136, at \*7.

## B. Susan Was Not Sanctioned

The Knoderers put forth four arguments in support of their point of error. First, they argue that the monetary sanctions effectively sanction Susan since she has been married to William for thirty-five years and the sanctions necessarily reach their community property. The Knoderers point out that we have previously found that there was no evidence that Susan committed any sanctionable conduct. *See Knoderer I*, 2014 WL 4699136, at \*14–16. Since she was not the

11

offender, they reason, the trial court could not assess monetary sanctions against William since it would subject Susan's community assets to satisfy the monetary sanctions.

As we noted in *Knoderer I*, "[i]t is inappropriate to hold one party liable for another party's misconduct." *Id.* at *14 (citing *Bodnow Corp. v. Hondo*, 721 S.W.2d 839, 840 (Tex. 1986) (per curiam)). Further, sanctions should only be assessed against the true offender. *Id.* (citing *Am. Flood Research, Inc.*, 192 S.W.3d at 583). Since there was no evidence that Susan committed any wrongdoing, we held that she was not the true offender and could not be held personally liable for William's actions. *Id.* at 14–15. On remand, the trial court only assessed sanctions against William, and we agree that Susan cannot be held personally liable for those sanctions. However, "[t]his does not mean that all of Susan's property is completely exempt from liability." *Id.* at 15 n.17 (citing TEX. FAM. CODE ANN. § 3.202(d) (West Supp. 2013)).

Section 3.202(d) of the Texas Family Code provides, "All community property is subject to tortious liability of either spouse incurred during marriage." TEX. FAM. CODE ANN. § 3.202(d) (West Supp. 2016). A tort is defined in part as "a breach of a duty that the law imposes on persons who stand in a particular relation to one another." *Tort*, BLACK'S LAW DICTIONARY (10th ed. 2014). The Texas Rules of Civil Procedure impose duties upon parties to a lawsuit during the process of discovery and allow a trial court to impose sanctions on a party who breaches those duties, i.e., abuses the discovery process. *See* TEX. R. CIV. P. 215.2–.5. While not a tort in the traditional sense, discovery abuse may be viewed as a tort. *See Sanctions Tort*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining a "sanctions tort" as "[a] means of recovery for another

12

party's discovery abuse, whereby the judge orders the abusive party to pay a fine to the injured party for the discovery violation").

As we noted in *Knoderer I*, the evidence supported the trial court's implied finding that William fabricated photographs that he claimed were photographs of the fitting removed from his house. *Knoderer I*, 2014 WL 4699136, at *4, *8. He then used those fabricated photographs to support a motion to strike the testimony of Rios, claiming that they proved that Rios did not have the fitting that was removed from the Knoderers' house. *Id.* at *4. We also detailed William's resistance to producing the photographs in native format and his initial use of a software program to delete files from his computer. In addition, we detailed his subsequent use of software programs to further delete files from his hard drives after the trial court ordered him to produce digital images of the hard drive and directed him that the hard drives were "not to be in any way altered or disposed of" and that "[e]verything [was] to be preserved and not altered in any way." *Id.* at *4–5. Thus, William not only breached the duties imposed on him by the Texas Rules of Civil Procedure, he blatantly disobeyed the orders of the trial court by altering the hard drives. At a minimum, his behavior for which he incurred liability was tortious. Therefore, even though Susan is not personally liable for William's tortious and sanctionable conduct, her community property may be subject to the liability resulting from it. *See* TEX. FAM. CODE ANN. § 3.202(d).

## C.    William's Conduct Was Sanctionable

Next, the Knoderers argue that sanctions were improper because the fabricated photographs were not relevant to any issue in the case and that sanctions that do not go to the heart of the case are inappropriate. The Knoderers made this same argument in the prior appeal of this

13

case.  In *Knoderer I*, we held that considering the egregious nature of William's conduct, "[t]he trial court clearly would have had discretion to find William in contempt or to assess lesser sanctions targeted to address any prejudice suffered by State Farm."  *Knoderer I*, 2014 WL 4699136, at *11.  We will not revisit that holding in this appeal.

### D.    The Sanctions Were Not Excessive

The Knoderers also argue that the sanctions were excessive since the trial court could have excluded the fabricated photographs as a lesser sanction.  They further argue that since they stated that they had no intention of using the photographs in evidence as early as January 19, 2011, State Farm's expenditure of attorney fees and expert fees in pursuing the matter after that date was self-inflicted, citing *Kings Park Apartments, Ltd. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 101 S.W.3d 525, 541 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).[8]

The Knoderers' arguments are premised on the assumption that excluding the photographs from evidence would have been an appropriate lesser sanction that would have been sufficient to promote compliance.  *See Am. Flood Research, Inc.*, 192 S.W.3d at 583.  This ignores the fact that William fabricated evidence and then used the fabricated evidence in support of a motion to exclude Rios' testimony filed in this cause.[9]  It also ignores William's conduct in resisting discovery of the photographs and his deletion of files off his hard drives in an effort to prevent

---

[8]In *Kings Park Apartments*, the court of appeals upheld the trial court's refusal to award attorney fees as sanctions since the non-sanctioned party had expended them in an effort to gain information to use in other cases.  *Kings Park Apartments, Ltd.*, 101 S.W.3d at 541.  Thus, unlike in this case, the expenditure of attorney fees was not caused by the conduct of the sanctioned party.

[9]Knowingly using fabricated evidence with the intent to affect the course or outcome of a court proceeding is a third degree felony.  TEX. PENAL CODE ANN. § 37.09(a)(2), (c) (West Supp. 2016); *see Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 235 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).

State Farm from proving when the photographs were actually taken, even though such action had been explicitly prohibited by the trial court. It was the Knoderers' initial use of the photographs in their motion to exclude, and the subsequent conduct by William, that necessitated State Farm's expenditure of attorney fees and expert fees in its effort to determine the truth behind William's attempted ruse. Exclusion of the photographs would have simply placed the Knoderers in the position they were in before William fabricated them. Further, exclusion of the photographs would have prevented their proper use by State Farm to impeach the veracity of William's testimony. *See Daniel*, 981 S.W.2d at 235. Finally, excluding the photographs, without more, would not have remedied the prejudice to State Farm caused by William's discovery abuse. *See Am. Flood Research, Inc.*, 192 S.W.3d at 583.

**E.     Only Attorney Fees, Expert Fees, and Costs Related to William's Conduct Were Assessed**

Next, the Knoderers argue that the trial court awarded improper items as sanctions. They argue that only the attorney fees and costs incurred in preparing and filing the motion for sanctions, attending the hearing, and preparing an order are recoverable under Rule 215.1, citing *In re White*, 227 S.W.3d 234, 237 (Tex. App.—San Antonio 2007, orig. proceeding, mand. denied). The court of appeals in *White* did not so hold, and the Knoderers cite no other authority for their argument. Further, State Farm sought sanctions under Rule 215.3. *See* TEX. R. CIV. P. 215.3. Rule 215.3 authorizes the trial court to "impose any appropriate sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of rule 215.2(b)" on a party abusing discovery. *Id.* This includes charging all

15

discovery expenses, reasonable expenses, and court costs on the abusing party. *See* TEX. R. CIV. P. 215.2(b)(2), (8).

In *Knoderer I*, we noted that sanctions should be limited to those fees and costs "incurred because of the sanctionable conduct." *Knoderer I*, 2014 WL 4699136, at *14 (quoting *Low v. Henry*, 221 S.W.3d 609, 621 (Tex. 2007)). We also concluded that "[o]nly the attorneys' fees, expert fee, and costs related to the six fabricated photographs should be included in the sanctions." *Id.* The Knoderers complain that State Farm simply arbitrarily reduced some of its attorney fees with no basis. However, the evidence introduced at the hearing on the motion for lesser sanctions shows State Farm presented testimonial and documentary evidence showing it had segregated all of the attorney fees, expert fees, and costs related to the fabricated photographs. Therefore, the record shows that the trial court only awarded those attorney fees, expert fees, and costs related to William's sanctionable conduct.[10]

We find that the trial court did not abuse its discretion in its assessment of lesser sanctions against William. We overrule the Knoderers' first point of error.

### III. Any Error in Admitting Spoliation Evidence and Giving A Spoliation Instruction Was Harmless

In their third point of error, the Knoderers argue that the trial court erred in admitting spoliation evidence and in giving an instruction on spoliation of evidence to the jury.[11] They argue

---

[10]The Knoderers also argue that the monetary sanctions are all related to State Farm's attempt to obtain death penalty sanctions and therefore should be reversed. However, they make no citations to the record or to appropriate authorities in support of this argument. *See* TEX. R. APP. P 38.1(i). Therefore, this argument is waived. *In re Estate of Curtis*, 465 S.W.3d 357, 379 (Tex. App.—Texarkana 2015, pet. dism'd).

[11]The Knoderers do not assign error regarding the spoliation instruction as a separate issue, but do complain that the trial court erred in giving the instruction in their argument regarding the trial court's admission of spoliation evidence.

that the admission of the fabricated photographs and any testimony regarding them was an abuse of discretion and that the trial court compounded the error by submitting a spoliation instruction. In their brief, the Knoderers do not provide any analysis showing that the admission of the evidence and the giving of the instruction "probably caused the rendition of an improper judgment." *See* TEX. R. APP. P. 44.1(a)(1). Rather, they argue that the harm is presumed.

### A.    Standard of Review

A trial court's admission of spoliation evidence, as well as its submission of a spoliation instruction, are reviewed under an abuse-of-discretion standard. *Smith v. Williams*, No. 06-14-00040-CV, 2015 WL 3526089, at \*6 (Tex. App.—Texarkana May 29, 2015, no pet.) (mem. op.) (citing *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014)). The trial court abuses its discretion when its "ruling is issued 'without reference to any guiding rules and principles.'" *Knoderer I*, 2014 WL 4699136, at \*6 (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). In determining "the propriety of the trial court's actions, we use the framework articulated in . . . *Brookshire Brothers*." *Williams*, 2015 WL 3526089, at \*6 (citing *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014); *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 918 (Tex. 2015) (per curiam)); *see Brookshire Bros.*, 438 S.W.3d at 19–22 (Tex. 2014). If the trial court abused its discretion, we will reverse its judgment "only if it 'probably caused the rendition of an improper judgment.'" *Williams*, 2015 WL 3526089 at \*6 (quoting *Brookshire Bros.*, 438 S.W.3d at 29).

---

Appellants may assign error "in the body of their appellate brief," even if it is not separately presented as an issue. *Perry v. Cohen*, 272 S.W.3d 585, 586 (Tex. 2008) (per curiam). Further, State Farm has briefed this issue. Therefore, we address the merits of this issue.

Under this framework, it is the trial court, not the jury, that determines whether spoliation of evidence has occurred and, if it has, that imposes the appropriate remedy. *Id*. (citing *Brookshire Bros.*, 438 S.W.3d at 20). Since the trial court determines whether spoliation occurred, "evidence of the circumstances surrounding alleged spoliation is generally inadmissible at trial, as such evidence is largely irrelevant to the merits and unfairly prejudicial to the spoliating party." *Id.* (quoting *Petroleum Sols.*, 454 S.W.3d at 488 (citing *Brookshire Bros.*, 438 S.W.3d at 26)). The trial court may find that spoliation occurred if it determines (1) a party had a duty to preserve evidence and (2) it "breached its duty to reasonably preserve material and relevant evidence." *Id.* (quoting *Petroleum Sols.*, 454 S.W.3d at 488).

If the trial court finds that spoliation has occurred, it must then determine the appropriate remedy. *Id.* In determining the appropriate remedy, the trial court should consider "both the culpability of the spoliating party and the prejudice to the other party." *Id.* (citing *Brookshire Bros.*, 438 S.W.3d at 21). In evaluating prejudice, courts consider

> the relevance of the spoliated evidence to key issues in the case, the harmful effect of the evidence on the spoliating party's case (or, conversely, whether the evidence would have been helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used instead of the spoliated evidence.

*Id.* (quoting *Brookshire Bros*., 438 S.W.3d at 21–22 (citing *Trevino v. Ortega*, 969 S.W.2d 950, 958 (Tex. 1998) (Baker, J., concurring))).

The trial court may only submit a spoliation instruction "if it finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present

18

a claim or defense." *Id.* (quoting *Petroleum Sols.*, 454 S.W.3d at 489 (citing *Brookshire Bros.*, 438 S.W.3d at 23–26)). Further, giving a spoliation instruction may, at least in some instances, be "tantamount to a death-penalty sanction." *Brookshire Bros.*, 438 S.W.3d at 23. Therefore, the trial court must determine "that a lesser remedy would be insufficient to ameliorate the prejudice caused by the spoliating party's conduct." *Id.* at 25 (citing *TransAmerican*, 811 S.W.2d at 917); *see Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 489 (Tex. 2014).

### B. Evidence Related to the Fabricated Photographs and the Spoliation Instruction

Evidence of the fabricated photographs first surfaced at trial during State Farm's cross-examination of William in an effort to impeach his credibility. State Farm examined William regarding his deposition testimony in which he claimed that he had obtained the fitting that was involved in the leak, marked it, photographed it, and then gave the fitting to Taylor. William admitted that he "probably" did not give the fitting to Taylor, but denied that the photographs were fabricated. He also admitted that the photographs did not appear to have been taken the day after the leak, even though that is what the metadata on the photographs showed. Later, William again denied that the photographs were fabricated, but took the position that they were taken the day after the leak and that he gave the fitting to Taylor.

Then, over his attorney's objection,[12] William was examined regarding his computer files as follows:

---

[12]The Knoderers originally objected to the introduction of the fabricated photographs on the basis that they were spoliation evidence. After their objection was overruled, they obtained a running objection regarding the photographs and any testimony relating to them. They again objected before William was examined regarding the computer files, again on spoliation grounds. When this objection was overruled, he indicated his understanding that he had a running objection, to which the trial court responded, "Okay." Therefore, it appears from the record that the parties and the

19

Q       (by Defendants)   All right. And Dr. Knoderer, as -- during this litigation -- part of this lawsuit, you were asked to preserve your computer for forensic examination, were you not?

A       Yes.

Q       And you testified under oath that you would preserve the data on the computer and not erase things?

A       That's correct.

Q       And, in fact, you did erase things after testifying that you would not do so; isn't that right?

A       No.

Q       It's your testimony under oath you didn't run any eraser programs?

A       That is correct.

Susan was also examined about the fabricated photographs on cross-examination.  She testified that William had told her that he engraved the fitting and gave it to Taylor and that they had used the photographs in an attempt to discredit Rios' testimony.  She also confirmed that William had agreed to preserve his computer files and that they had had a discussion in which she and William agreed they would preserve the hard drives.

The only other significant testimony regarding the fabricated photographs came through Gavin Manes, a digital forensic certified practitioner.  Manes testified that he was asked to examine the fabricated photographs to determine their authenticity and whether the information within them was correct.  Manes testified that the fabricated photographs were taken with a Nikon D300 camera

---

trial court understood the running objection to encompass the fabricated photographs and their related testimony, as well as testimony regarding the destruction of William's computer files.

20

and described how he used a Nikon authenticator program to determine whether the metadata was authentic, or if it had been altered. He then described the process whereby, using the authenticator, he examined other indices in the metadata and the shutter count, which the user cannot reset, and determined that the fabricated photographs were taken between April 13, 2009, and May 21, 2009. In addition, he testified that the 1.1 update to the camera's firmware was not released until October 24, 2008. Since the fabricated photographs were taken using the 1.1 firmware, Manes concluded that they could not have been taken before October 24, 2008. Based on that evidence, Manes testified that whoever took the fabricated photographs changed the date and time on the camera, which a user can manipulate, took the photographs, then changed the date and time back.

Manes also testified that he had received data culled from William's hard drive by an independent expert. He went on to testify that this data showed that after the date William agreed not to delete or alter any of the files and before he produced his hard drives, three different software programs that allow the user to erase and wipe files were run multiple times. In addition, he testified that another program that allows the user to delete and wipe entries out of the computer registry was also used. He testified that each of those programs was run by affirmative action taken by somebody and that as a result of their use, the originals of the fabricated photographs could not be found. Manes also testified that the use of the erasure programs prevented him from obtaining other information that would have narrowed the time period, or shown an exact date, when the fabricated photographs were taken. He also testified, however, that he could not be certain that the fabricated photographs were still on the hard drives when the erasure programs were run.

21

Over the Knoderers' objection, the trial court also submitted the following instruction to the jury:

> In this case, if William Knoderer knowingly permitted a computer hard drive to be destroyed, if you find that information contained in the hard drive was evidence relevant to the issues in this case, and if its non-preservation has not been satisfactorily explained, then you are instructed that you may consider such evidence would have been unfavorable to the Knoderers.[13]

The Knoderers only objected, and only complain on appeal, to the trial court's submission of this instruction, but not to its content.

**C.      Analysis**

**i.      Admission of Spoliation Evidence**

In *Brookshire Brothers*, the Supreme Court explained that not all evidence of the circumstances surrounding a party's spoliation of evidence is inadmissible. Only the evidence that the alleged spoliating party breached a duty to preserve evidence or acted with the requisite intent is improperly admitted. *See Brookshire Bros.*, 438 S.W.3d at 28–29. However, "to the extent permitted by the Texas Rules of Evidence, parties may present indirect evidence to attempt to prove the contents of missing evidence that is otherwise relevant to a claim or defense." *Id.* at 26. In this case, the fabricated photographs and the associated testimony, including Manes' testimony regarding his analysis of the metadata taken from the camera used to take the photographs, were relevant to State Farm's defenses of intentional acts by the insured and concealment or fraud by

---

[13]This is a hybrid spoliation instruction that is improper under current law since the trial court, not the jury, determines whether the spoliation of relevant evidence has occurred. *Brookshire Bros.*, 438 S.W.3d at 20; *see, e.g.*, Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice* PJC 40.12 (2014).

the insured.[14]  In addition, they were relevant to impeaching William's credibility.  *See* TEX. R.
EVID. 607.  Further, this evidence could be presented without reference to William's breach of his
duty to preserve his computer hard drives and the purposeful destruction of the same.  Therefore,
we find that the trial court did not abuse its discretion in admitting this evidence.

However, the Supreme Court has also made it clear that "there is no basis on which to
allow the jury to hear evidence that is unrelated to the merits of the case, but serves only to
highlight the spoliating party's breach and culpability."  *Brookshire Bros.*, 438 S.W.3d at 26.  In
this case, the only evidence that William destroyed was the files on his computer hard drive.  While
the originals of the fabricated photographs contained on the hard drive and information pinpointing
the exact date they were taken may have had some relevance to State Farm's defenses, this
evidence was not essential to these defenses in light of the other evidence at trial, especially Manes'
admissible testimony regarding the camera's metadata.  Further, the evidence and testimony
showing the purposeful erasure of the hard drives, particularly Manes' testimony regarding these
issues, only highlighted William's failure to preserve the hard drives and his purposeful erasure of

---

[14]These defenses are based on the following provisions in the Knoderers' insurance policy:

> Intentional Acts.  If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void as to you and any other **insured** that caused or contributed to the loss or its procurement.
>
> . . . .
>
> Concealment or Fraud.  This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

(Emphasis added).

them.  Under *Brookshire Bros.*,[15] we find the admission of this evidence was improper and an abuse of discretion.

## ii.    The Spoliation Instruction

In *Knoderer I*, we noted that in entering its prior sanction order, the trial court had made implied findings that William had destroyed computer data related to the fabricated photographs. *Knoderer I*, 2014 WL 4699136, at *8.  On remand, State Farm filed its motion for lesser sanctions, which included a request for both monetary sanctions and a spoliation instruction.  After a hearing on the motion, the trial court granted the motion "in full" and made specific findings that William intentionally destroyed hard drives that contained evidence relevant to the fabricated photographs after being ordered by the trial court to preserve the evidence.  The trial court also found that the award of monetary sanctions was "an appropriate sanction for . . . [William's] conduct."  After a trial on the merits, the trial court gave the spoliation instruction set out above.

By granting the motion in full and later submitting a spoliation instruction, the trial court made an implied finding that the monetary sanctions were not sufficient to remedy the prejudice to State Farm.  In this case, in evaluating the prejudice to State Farm, we consider (1) the relevance of the destroyed evidence to key issues in the case, (2) whether the destroyed evidence would have been helpful to State Farm's case, and (3) whether the destroyed evidence was cumulative of other

---

[15]We recognize that this is not a typical spoliation case in which evidence pertinent to a claim or defense is destroyed that may impair a party's presentation of its claim or defense, which was what *Brookshire Brothers* and its progeny address.  Rather, in this case, a party fabricated evidence, which he then used in the proceeding, and, after evidence surfaced indicating he fabricated the evidence, destroyed the only evidence that would conclusively establish his fabrication.  Thus, in this case, the spoliating party committed a fraud not only on his opposing party, but on the trial court.  Therefore, policy considerations not addressed in *Brookshire Brothers* are presented in this case.  Although these policy considerations might justify an exception to the requirements of *Brookshire Brothers*, the parties have not briefed this issue.

evidence that may have been used in support of State Farm's defenses. *See Brookshire Bros.*, 438 S.W.3d at 21–22 (citing *Trevino*, 969 S.W.2d 950 at 958). Here, assuming the destroyed evidence would have conclusively established that the originals of the fabricated photographs were taken on a date certain, this evidence would have been relevant to State Farm's defenses and would have been helpful in establishing those defenses. However, this evidence was generally cumulative of Manes' testimony regarding the camera's metadata. Through Manes' other testimony, State Farm was able to refute William's claim that the fabricated photographs were taken the day after the leak, to show that the photographs could not have been taken until at least eight months after the leak, and more probably well over a year after the leak, and to show that a user of the camera had manipulated the metadata to make it appear that the photographs were taken the day after the leak. Thus, State Farm was not prevented from presenting its defenses even in the absence of the spoliated evidence. As a result, we find that this record does not support the trial court's implied finding that the lesser monetary sanctions were not sufficient to remedy any prejudice to State Farm. *See Brookshire Bros.*, 438 S.W.3d at 25. Therefore, we find that the trial court abused its discretion in submitting the spoliation instruction.

### iii.    Harmless Error

Although the trial court erred in admitting the spoliation evidence and submitting the spoliation instruction, its error is only reversible if it "probably caused the rendition of an improper judgment." *Id.* at 29 (quoting TEX. R. APP. P. 61.1(a)); *see* TEX. R. APP. P. 44.1(a)(1). To determine whether the admission of the spoliation evidence was harmful, "[w]e review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular

evidence admitted." *Brookshire Bros.*, 438 S.W.3d at 29 (quoting *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). In their brief, the Knoderers emphasize the admission of the fabricated photographs as evidence of harm. However, we have held that this evidence was admissible. They make no demonstration of how the judgment turned on the admission of evidence of the destruction of the hard drives. Neither do we find that the judgment turned on this evidence.

As we have previously discussed, this evidence was relevant to State Farm's defenses of intentional acts by the insured and concealment or fraud by the insured. The jury found these issues in favor of State Farm. At trial, there was abundant evidence to support the jury's verdict without the evidence of the destruction of the hard drives. The jury heard evidence concerning the Knoderers' prior water damage claim and failed lawsuit against State Farm in which they claimed their house was uninhabitable because of black mold, and their expenditure of $400,000 for attorney fees in that suit. The evidence also showed that six days after the verdict in the First Lawsuit, the Knoderers secured a mold endorsement that was bound for forty-five days, that State Farm notified them of its rejection of the coverage and that it would end in early March, and that the flood in this case occurred after that notification, but shortly before the mold coverage would end. The jury also heard the Knoderers testify that their house was in ideal condition on the day of the second flood, even though they were claiming it was uninhabitable only six weeks earlier.

The jury also heard William's inconsistent prior claims that on the morning after the leak, he had marked the fitting involved in the leak, photographed it, then given it to Taylor. At trial, William then testified that he probably had not given the fitting to Taylor or taken the photographs

26

on the morning after the leak, only to later deny that the photographs were fabricated and claim he took them on the morning after the leak and gave the fitting to Taylor. Manes testified regarding the fabricated photographs, the camera that took the photographs, and the metadata that indicated the photographs had been taken over a year after the leak and after State Farm ultimately denied coverage. He also testified that somebody had changed the date and time on the camera, took the photographs, then changed the date and time back. Rios offered testimony that after his analysis of photographic evidence, the pipe and fitting given to him by Taylor were the same pipe and fitting taken out of the Knoderers' house. He also testified that based on his testing of similar fittings and pipes, and the markings on the fitting and pipe given to Taylor, the pipe could only have come loose as the result of human manipulation. Other than offering testimony through Tyson and Ronnie that might cast doubt as to whether Taylor and Rios had been given the fitting and pipe taken out of the Knoderers' home, the Knoderers offered no evidence to dispute Manes' and Rios' testimony.

In its opening statement, State Farm emphasized the evidence and testimony that would support its defenses, including the evidence discussed above, but never mentioned the destroyed hard drives. In its closing argument, State Farm again emphasized the evidence that indicated the Knoderers intentionally caused the leak and that William had fabricated the photographs in support of its defensive theories, but did not mention the destroyed hard drives in support of those theories. State Farm only mentioned the evidence concerning the destroyed hard drives in relation to the Knoderers' request for an award of attorney fees, arguing that the attorney fees were inflated because of the time spent resisting discovery of the fabricated photographs, hearings associated

27

with their resistance, and the destruction of the hard drives. State Farm's argument comprises approximately twenty-three pages in the reporter's record, of which approximately one and one-third pages discussed the destroyed hard drives to some degree.

One of the principle reasons spoliation evidence should be not be admitted is "the tendency of such evidence to skew the focus of the trial from the merits to the conduct of the spoliating party [thereby] rais[ing] a significant risk of both prejudice and confusion of the issues." *Id.* at 26. This record reflects, however, that the spoliation evidence was a peripheral issue, was treated as such by the parties, and did not tend to divert the focus of the trial from the merits of the case. Thus, we do not believe this record demonstrates that the admission of the spoliation evidence "probably caused the rendition of an improper judgment." *Id.* at 29; *see* TEX. R. APP. P. 44.1(a)(1). We find that the trial court's error in admitting the spoliation evidence was harmless.

The trial court's error in submitting a spoliation instruction will also only be reversed if "it probably caused the rendition of an improper judgment." *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 921 (Tex. 2015) (per curiam). We review the entire record to determine whether the instruction was harmful. *See id.* at 922; *Brookshire Bros.*, 438 S.W.3d at 29. As the Knoderers point out, "if a spoliation instruction should not have been given, the likelihood of harm from the erroneous instruction is substantial, particularly when the case is closely contested." *Wackenhut Corp.*, 453 S.W.3d at 921–22 (quoting *Brookshire Bros.*, 438 S.W.3d at 29 (quoting *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003))); *Williams*, 2015 WL 3526089, at *9. However, while the likelihood of harm may be substantial, this does not mean there is harm in all cases. In *Brookshire Brothers*, significant emphasis was placed on the spoliation issue during

28

opening and closing arguments, as well as in testimony. *Brookshire Bros.*, 438 S.W.3d at 29. These same factors were present in *Wackenhut Corp.*, 453 S.W.3d at 922. In both of those cases, the Supreme Court placed particular importance on trial counsel's significant emphasis on the spoliation instruction during its final argument. *Id.*; *Brookshire Bros.*, 438 S.W.3d at 29. We found the same significant emphasis on the spoliation issue throughout the trial testimony in *Williams*, as well as significant emphasis on the issue by trial counsel in its opening and closing statements. *Williams*, 2015 WL 3526089, at *10.

By contrast, the spoliation issue in this case was a peripheral issue, and the parties treated it as such. During testimony, the issue was touched on briefly in the cross-examination of William and Susan, and more in depth with Manes, but constituted a very small fraction of the testimony given in this eight-day trial. Further, the issue was not addressed during opening statements and was only mentioned briefly in closing argument. Finally, the instruction itself was a hybrid spoliation instruction that left it up to the jury to determine whether any relevant evidence was destroyed and, if they determined it was, allowed the jury to presume it was harmful to the Knoderers. Since Manes acknowledged that he did not know whether the fabricated photographs were on the hard drives at the time the erasure programs were run, it is not clear that the jury found any relevant evidence was destroyed. Based on the entire record, we cannot say that the spoliation instruction given by the trial court probably caused the rendition of an improper verdict. *Wackenhut Corp.*, 453 S.W.3d at 921; *see* TEX. R. APP. P. 44.1(a)(1).

Therefore, we find that the trial court's error in submitting the spoliation evidence was harmless. We overrule the Knoderers' third point of error.

29

## IV.     Any Error in the Jury Charge Was Harmless

In their fourth point of error, the Knoderers complain that the trial court erred in submitting certain jury issues and instructions.  First, the Knoderers complain that the trial court instructed the jury that

> [e]xtra-contractual damages are recoverable when the insurer commits an act which is so extreme that it causes an injury which is independent of and unrelated to the claim under the insurance policy.  Extra-contractual damages must be some compensable injury independent of the policy claim, or damages other than those which would have been available as the proceeds of the policy.

They argue that this is a misstatement of the law since it is inapplicable to their misrepresentation claims.  Next, they complain of the trial court instructing the jury that "[t]he Knoderers must prove their damages, if any, with reasonable certainty and are not entitled to recover damages that are too remote, too uncertain, or purely conjectural."  This, they argue, was also a misstatement of the law.  Both of these instructions were included in the trial court's general instructions regarding the Knoderers' damages.  The Knoderers also complain that the trial court did not follow the law when it included an instruction in addition to what is contained in the pattern jury charge in its jury issue regarding whether State Farm made any misrepresentations that caused damages to Susan.[16]  Their fourth complaint is that the trial court submitted issues related to State Farm's intentional acts by the insured and concealment or fraud by the insured defenses.  The Knoderers argue that this was error because these defenses are not applicable to their misrepresentation claims brought under the Insurance Code.

---

[16]The instruction was not included in the issue regarding any misrepresentation made by State Farm that caused damages to William.

30

## A.     Standard of Review

We review jury charge error under an abuse-of-discretion standard.  *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam).  "A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (citing TEX. R. APP. P. 61.1).  Generally, if a charge error relates to a contested, critical issue, it is considered harmful.  *Id.*  The error is harmless, however, "when the findings of the jury in answer to other issues are sufficient to support the judgment."  *Shupe*, 192 S.W.3d at 579 (quoting *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980)); *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) (jury question may be immaterial and harmless "when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict").  Further, "whether a charge submits the controlling issues in a case, in terms of proper theories of recovery or defense, is a question of law we review *de novo.*"  *Fin. Ins. Co. v. Ragsdale*, 166 S.W.3d 922, 926 (Tex. App.—El Paso 2005, no pet.) (citing *Cimarron Country Prop. Owners Ass'n v. Keen*, 117 S.W.3d 509, 511 (Tex. App.—Beaumont 2003, no pet.)).

## B.     Any Error by the Trial Court Was Harmless

Initially, we note that the Knoderers' first two complaints concern the trial court's instructions regarding their damages.  In its verdict, the jury answered the questions regarding State Farm's liability to Susan and William, as well as the questions relating to State Farm's

31

defenses, in favor of State Farm and therefore was not required to answer the damages issues.[17] Therefore, any error in these instructions would be immaterial and harmless if the jury's answers to the questions concerning State Farm's liability or its defenses will support the verdict. *See Shupe*, 192 S.W.3d at 579.

In their third complaint, the Knoderers complain of the court's addition of an instruction to its jury issue regarding whether State Farm made any misrepresentations that caused damages to Susan: "You are further instructed that if the Knoderers failed to provide State Farm with all the material and pertinent facts prior to the time State Farm made a representation relating to coverage for the loss, there could be no misrepresentation by State Farm." The trial court is given considerable discretion in determining proper jury instructions, and "[a]n instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009)). The Knoderers acknowledge that the instruction is based on the Texas Supreme Court's holding in *Provident American Insurance Co. v. Castaneda*, 988 S.W.2d 189 (Tex. 1998). Nevertheless, they argue that the court's ruling was limited to the facts of that case. We disagree.

In *Castaneda*, Guillermo Castaneda applied for medical insurance for his family from Provident American. In his application, Guillermo failed to disclose that two days before he applied, his son had been treated for jaundice, anemia, and hepatitis and that several years earlier,

---

[17]The jury was instructed to not answer the damages question if it found that State Farm did not make misrepresentations to Susan or William, or if it found that either of the Knoderers (1) caused or contributed to the loss, (2) intentionally concealed or misrepresented any material fact to State Farm, or (3) committed fraud against State Farm.

32

his daughter, Denise, had been treated for jaundice and hepatitis. The policy was issued and contained two provisions that (1) excluded coverage of an illness that manifested within thirty days of the effective date of the policy and (2) excluded diseases of certain organs, including the gallbladder, unless the loss occurred more than six months after the effective date. Within thirty days of the issuance of the policy, Denise's uncle was diagnosed with an hereditary condition that causes anemia, jaundice, and gallstones. On the thirty-third day after issuance, Denise saw a doctor who diagnosed her with the same hereditary condition. *Id*. at 191. Two weeks later, Denise had her spleen and gallbladder removed. *Id.* at 191–92. After Provident American denied the claim, Denise sued it under the Deceptive Trade Practices Act (DTPA) and the Insurance Code based, in part, on Provident American representing that the claim was covered when it pre-approved the surgery. *Id.* at 192, 199.

The Supreme Court noted that at the time the pre-approval was made, Provident American had not been given material facts, set forth above, that both the Castanedas and Denise's physicians knew. *Id.* at 200. Since the Castanedas had withheld these material and pertinent facts from Provident American, the court held that "[t]he pre-approval [did] not constitute a false, misleading, or deceptive act; a misrepresentation of the terms of an insurance policy; or an assertion with respect to insurance that was untrue." *Id.* In such a situation, Provident American could not be "subject . . . to liability under the DTPA or article 21.21[18] because neither the insureds nor their physicians imparted key facts before the pre-approval was given." *Id.* The court went on to reason that if an insurer could be held liable, it "would impose strict liability on carriers that are not given

---

[18]Now Chapter 541 of the Texas Insurance Code.

pertinent facts before a procedure is pre-approved and who later learn that they have a good faith, reasonable basis for denying coverage." *Id.*

Thus, the holding in *Castaneda* was not limited to the facts of that particular case, but would also apply in those cases where, as here, the insurer made representations related to coverage, or approved remedial procedures, before learning that the insured failed to provide material and pertinent facts that would provide a good-faith basis for denying coverage. Therefore, we find that the trial court's instruction was a correct statement of the law. As seen above, the instruction also has support in the evidence and the pleadings. We also find that it would be helpful to the jury, since it provides guidance in the proper application of the law to the evidence.

Therefore, we find that the trial court did not abuse its discretion in submitting this instruction. As we noted earlier, the jury answered both questions regarding State Farm's liability to Susan and William in favor of State Farm. As a result of those answers, it was not required to answer the damages questions. Since the Knoderers' first two complaints concern instructions related to the damages questions, any error in those instructions would be immaterial and harmless. *See Alvarado*, 897 S.W.2d at 752. Further, since the jury's answers to the liability questions are sufficient support for the trial court's take-nothing judgment in favor of State Farm, any error in submitting the issues relating to State Farm's defenses was harmless. *See Shupe*, 192 S.W.3d at 579. We overrule the Knoderers' fourth point of error.

## V.     Any Error Related to the Rios Testimony Was Not Preserved

In their fifth point of error, the Knoderers assert that the trial court erred in allowing Rios to testify. The Knoderers argue that Rios violated the Texas Private Security Act by acting as an

34

investigations company without a license. We find that the Knoderers did not preserve this point of error.

"Preservation of error is a systemic requirement on appeal. . . . Ordinarily, a court of appeals should review preservation of error on its own motion." *In re E.R.C.*, 496 S.W.3d 270, 276–77 (Tex. App.—Texarkana 2016, pet. denied), *pet. for cert. filed*, (U.S. Nov. 16, 2016) (No. 16-671) (quoting *Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009) (citations omitted)); *see In re M.M.L.*, 241 S.W.3d 546, 552 (Tex. App.—Amarillo 2006, pet. denied). If an issue has not been preserved for appeal, we should not address it on the merits. *E.R.C.*, 496 S.W.3d at 277. To preserve a complaint for appellate review, a party must both (1) make a timely request, objection, or motion stating the specific grounds, and (2) secure the court's ruling on its request, objection, or motion, or object to the trial court's refusal to rule. *Id.* (citing TEX. R. APP. P. 33.1(a)(1), (2)).

At trial, before Rios began his substantive testimony, the Knoderers lodged their objection to his testimony, asserting that it should be excluded because he lacked an investigations company license and was committing a misdemeanor. The following exchange took place at the bench:

> MS. BURKE [for State Farm]: I've encountered this issue before, Your Honor, and that has to -- it does not apply with litigation. He can come in and testify as an expert. We can go pull -- we can find that research. It's been years, but that's not a valid objection.

> MR. STEWART [for the Knoderers]: Judge, the statute specifically talks about procuring and doing evidence with regard to the loss and lawsuits.

> THE COURT: Why wasn't this brought up in pretrial? This is where this kind of issue should have been raised.

> MR. BOWMAN [for the Knoderers]: Well, I can take up --

35

THE REPORTER:  I'm sorry, I can't hear.

MR. BOWMAN:  It's going to impeach his credibility and it's not --

THE COURT:  But you're --

MR. BOWMAN:  -- so much --

THE COURT:  -- Daubert challenge, are you not?

MR. BOWMAN:  No, it's not a Daubert challenge, Your Honor.

THE COURT:  This then just goes to the weight.

MR. BOWMAN:  Well, that and we do have some case law, Your Honor, that basically says if the guy has committed a crime, such evidence shouldn't be admitted but that's not on a Daubert basis and I do have the cases with me.

MS. BURKE:  May I have those while we're --

MR. BOWMAN:  Yeah.

MS. BURKE:  -- to see --

MR. BOWMAN:  Yeah.

THE COURT:  All right. Go ahead.

State Farm then proceeded with the direct, substantive testimony of Rios.  At the conclusion of Rios' direct testimony, the Knoderers again asserted their objection and moved to exclude Rios' testimony.  After a hearing outside the presence of the jury, the trial court denied the motion as untimely.

This record shows that although the Knoderers made a timely objection prior to the introduction of Rios' testimony, they failed to obtain a ruling by the trial court on the objection. Therefore, no complaint was preserved for our review based on this objection.  *See* TEX. R. APP.

36

P. 33.1(a)(2); *Bushnell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (per curiam). Further, the Knoderers' objection and motion to exclude Rios' testimony asserted after the conclusion of his direct testimony were untimely and did not preserve this complaint for our review. *Miles v. Ford Motor Co.*, 922 S.W.2d 572, 591 (Tex. App—Texarkana 1996), *rev'd in part on other grounds by Ford Motor Co. v. Miles*, 967 S.W.2d 377 (Tex. 1998). We overrule this point of error.

## VI. State Farm Waived Attorney Fees

In their second point of error, the Knoderers assert that the trial court erred in awarding State Farm attorney fees under Section 541.153 of the Texas Insurance Code. *See* TEX. INS. CODE ANN. § 541.153. They argue (1) that the trial court was bound by our prior finding in *Knoderer I* that their claims were not meritless, (2) that the trial court erred in finding that the Knoderers' claims were groundless and brought in bad faith or for the purpose of harassment, and (3) that State Farm waived its entitlement to attorney fees by failing to secure jury findings on the amount of reasonable and necessary attorney fees. State Farm responds (1) that the law of the case doctrine is inapplicable in this case, (2) that the trial court's findings are supported by the record in this case, and (3) that no jury finding was necessary to its recovery of attorney fees. We agree with the Knoderers that State Farm waived its entitlement to attorney fees.

In its fifth amended answer and first amended counterclaim, State Farm asserted a counterclaim under Section 541.153, alleging that the Knoderers' claims were groundless and brought in bad faith or were brought for the purposes of harassment and asking for an award of its reasonable and necessary attorney fees. *See* TEX. INS. CODE ANN. § 541.143. At trial, State Farm did not offer any evidence of its attorney fees. Further, State Farm did not request, and the jury

37

charge did not include, an issue asking the jury to determine the amount of its reasonable and necessary attorney fees. After the jury returned its verdict, State Farm filed a motion for judgment on jury verdict and counterclaim, asking for a hearing before the trial court on its counterclaim under Section 541.153. At the post-trial hearing, State Farm offered evidence of its attorney fees and requested the trial court to enter its judgment based on the jury verdict and for its attorney fees pursuant to Section 451.153. After the hearing, the trial court entered its judgment against the Knoderers and for State Farm on its counterclaim under Section 541.153.

Section 541.153 provides, "A court shall award to the defendant court costs and reasonable and necessary attorney's fees if the court finds that an action under this subchapter is groundless and brought in bad faith or brought for the purpose of harassment." TEX. INS. CODE ANN. § 541.153. The Supreme Court has held, under the wording of a similar provision under the DTPA,[19] that whether an action is groundless, brought in bad faith, or brought for the purpose of harassment is a question to be determined by the trial court. *See Donwerth v. Preston II Chrysler–Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex. 1989). Our sister court has held that under the plain language of Section 541.153, these questions are also reserved for the trial court. *Vela v. Catlin Specialty Ins. Co.*, No. 13-13-00475-CV, 2015 WL 1743455, *13 (Tex. App.—Corpus Christi Apr. 16, 2015, pet. denied) (mem. op.). Neither of these cases addressed the question of whether the determination of the amount of reasonable and necessary attorney fees requested under Section

---

[19]*See* TEX. BUS. & COM. CODE ANN. § 17.50(c) (West 2011) (providing that "[o]n a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs").

541.153 is a question to be determined by the court or the jury. The parties have not cited, nor have we found, any cases that have decided this issue.

State Farm argues that a request for attorney fees under Section 541.153 is a request for sanctions, which is to be determined by the court, citing *Brantley v. Etter*, 677 S.W.2d 503 (Tex. 1984) (per curiam), and *Trussell Ins. Servs., Inc. v. Image Solutions, Inc.*, No. 12-09-00390-CV, 2010 WL 5031100 (Tex. App.—Tyler Dec. 8, 2010, no pet.) (mem. op.). Neither of these cases supports State Farm's argument. In *Trussell Insurance Services*, Trussell filed a counterclaim seeking sanctions under Rule 13 of the Texas Rules of Civil Procedure, and later amended its counterclaim to include requests for sanctions under Chapter 10 of the Texas Civil Practice and Remedies Code and Section 541.153 of the Texas Insurance Code. *Trussell Ins. Servs.*, 2010 WL 5031100, at *1. In its opinion, the court of appeals construed the counterclaim as a motion for sanctions and analyzed the appeal under Chapter 10 of the Texas Civil Practice and Remedies Code, never mentioning Section 541.153. The Supreme Court in *Brantley* simply held that under Rule 215 of the Texas Rules of Civil Procedure, "the amount of attorney's fees awarded as sanctions for discovery abuse is solely within the sound discretion of the trial judge." *Brantley*, 677 S.W.2d at 504 (citing TEX. R. CIV. P. 215).

By contrast, a claim brought under the similar DTPA provision has been held not to be a motion for sanctions, but rather to be an independent claim. In *Yuen v Gerson*, Gerson's former client, Law, filed suit against him under the DTPA. Yuen represented Law in the suit. *Yuen v. Gerson*, 342 S.W.3d 824, 826 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). During the course of the suit, Gerson filed a motion for sanctions against Law and Yuen under Rule 13 of the

Texas Rules of Civil Procedure, Chapters 9 and 10 of the Texas Civil Practice and Remedies Code, and Section 17.50(c) of the DTPA. In its final judgment, the trial court awarded Gerson attorney fees against both Law and Yuen, finding that the suit was groundless in violation of Rule 13, Chapters 9 and 10, and Section 17.50(c). *Id.* On appeal, the Houston court of appeals analyzed the award under Rule 13 and Chapters 9 and 10 as a motion for sanctions. *Id.* at 827–28. However, it held that "[a] claim for attorney's fees under section 17.50(c) is not a motion for sanctions; it is an independent claim." *Id.* at 829 (citing *Ortiz v. Collins*, 203 S.W.3d 414, 420–21 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding defendant's request for attorney fees under Section 17.50(c) in its answer was a counterclaim)). Since Yuen had not been served with Gerson's third-party claim under Section 17.50(c), the court of appeals held that the trial court lacked jurisdiction to award the attorney fees under Section 17.50(c). *Id.*

In *Ortiz*, the court of appeals, in holding that a defendant's request for sanctions under Section 17.50(c) was a counterclaim, reasoned:

> Claims for attorneys' fees under section 17.50(c) are routinely treated as counterclaims. *See, e.g.*, *Klein v. Dooley*, 949 S.W.2d 307, 307–08 (Tex. 1997); *N.Y. Underwriters Ins. Co. v. Sanchez*, 799 S.W.2d 677, 678–79 (Tex. 1990); *Vu v. Rosen*, No. 14-02-00809-CV, 2004 WL 612832, at *9 (Tex. App.—Houston [14th Dist.] Mar. 30, 2004, pet. denied) (mem. op.). This is also consistent with the treatment of requests for attorneys' fees in other contexts. *See In re Frost Nat'l Bank*, 103 S.W.3d 647, 650 (Tex. App.—Corpus Christi 2003, no pet.) ("An affirmative claim, stated in an answer, for recovery of attorney's fees for the preparation and prosecution of a defense constitutes a counterclaim."); *ECC Parkway Joint Venture v. Baldwin*, 765 S.W.2d 504, 514 (Tex. App.—Dallas 1989, writ denied) ("A claim for attorney's fees is a claim for affirmative relief.").

*Ortiz v. Collins*, 203 S.W.3d 414, 420–21 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also In re Sierra Title*, Nos. 13-10-055-CV & 13-10-099-CV, 2010 WL 1019632, at \*4 (Tex. App.—Corpus Christi March 18, 2010) (per curiam) (orig. proceeding) (mem. op.).

In this case, State Farm filed its request for attorney fees under Section 541.153 as a counterclaim. Both Section 17.50(c) and Section 541.153 contain similar wording and have the same purpose: to discourage the filing of frivolous lawsuits. Like a request for attorney fees under Section 17.50(c), a claim for attorney fees under Section 541.153 is an independent claim for affirmative relief.

Generally, when the recovery of attorney fees is authorized by a statute, the amount of reasonable and necessary attorney fees is a fact question to be determined by the jury. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (citing *Trevino v. Am. Nat'l Ins. Co.*, 168 S.W.2d 656, 660 (Tex. 1943)); *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 961 (Tex. 1996)); *see also City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 367 (Tex. 2000); *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 231 (Tex. 2010). In *Bocquet* and *City of Garland*, the relevant statutes were interpreted as providing that the trial court determine *whether* the party was entitled to attorney fees, but that the reasonableness and necessity of attorney fees remained a jury question. *Bocquet*, 972 S.W.2d at 21; *City of Garland*, 22 S.W.3d at 367. We find that the general rule should also apply to Section 541.153.

Since State Farm's counterclaim for attorney fees under Section 541.153 was an independent claim for affirmative relief, it had the burden to introduce evidence at trial and to request the submission of a jury question on its attorney fees. *See Intercontinental Grp. P'ship v.*

41

*KB Home Lone Star L.P.*, 295 S.W.3d 650, 659 (Tex. 2009) (citing TEX. R. CIV. P. 279). State Farm did neither. The issues regarding attorney fees were ones hinging on determinations of fact which should have been submitted to the jury. By failing to request the submission of a jury issue regarding the award of reasonable and necessary attorney fees, State Farm waived its right to recovery. *Stern v. Marshall*, 471 S.W.3d 498, 529 (Tex. App.—Houston [1st Dist] 2015, no pet.); *RDG P'Ship v. Long*, 350 S.W.3d 262, 277 (Tex. App.—San Antonio 2011, no pet.). Therefore, we find that the trial court erred in awarding State Farm attorney fees under Section 541.153. We sustain this point of error.

We modify the trial court's judgment to delete the award of attorney fees to State Farm under Section 541.153 and affirm the trial court's judgment, as modified.

Bailey C. Moseley
Justice

Date Submitted:     November 23, 2016
Date Decided:       January 13, 2017

42