

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00061-CV

IN THE ESTATE OF BILLY RAY MARTIN, JR., DECEASED

On Appeal from the 276th District Court
Marion County, Texas
Trial Court No. 2000151

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Billy Ray Martin, Jr., died on November 29, 2019. On behalf of Travis Andrew Martin, Martin's only child, Larry Keith Stone[1] filed an application to determine heirship. The application alleged that Martin was unmarried and died intestate, but Martin's death certificate said he was married to Summer Ray Barnwell a/k/a Summer Barnwell Martin at the time of his death. Summer opposed Stone's application and alleged that she was Martin's common-law wife. A Marion County jury determined that Martin was not married at the time of his death, and as a result, the trial court entered a judgment declaring Travis as Martin's sole heir.

On appeal, Summer argues (1) that the jury's finding was not supported by factually sufficient evidence, (2) that the trial court erred in admitting the testimony of a justice of the peace, and (3) that the trial court erred by admitting testimony that Martin had a will and wanted to leave his estate to Travis. We find that factually sufficient evidence supports the jury's finding that Martin was unmarried. We also overrule the only complaint that Summer preserved to the testimony of the justice of the peace and conclude that her complaints about Martin's will and wishes were not preserved for our review.[2] As a result, we affirm the trial court's judgment.

I.      **Factually Sufficient Evidence Supports the Finding that Martin Was Unmarried**

Summer argues that the evidence is factually insufficient to support the jury's finding that Martin was unmarried at the time of his death because she proved the existence of a common-law marriage. "An informal or common-law marriage exists in Texas if the parties (1) agreed to

---

[1]Stone is Travis's maternal grandfather.

[2]We also overrule Summer's complaint about cumulative error.

2

be married, (2) lived together in Texas as husband and wife after the agreement, and (3) represented to others that they were married." *Burden v. Burden*, 420 S.W.3d 305, 308 (Tex. App.—Texarkana 2013, no pet.) (citing TEX. FAM. CODE ANN. § 2.401(a)(2); *Russell v. Russell*, 865 S.W.2d 929, 932 (Tex. 1993); *Crenshaw v. Kennedy Wire Rope & Sling Co.*, 327 S.W.3d 216, 222 (Tex. App.—San Antonio 2010, no pet.)). "An informal marriage does not exist until the concurrence of all three elements." *Id.* (citing *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)).

"The existence of an informal marriage is a fact question, and the party seeking to establish existence of the marriage bears the burden of proving the three elements by a preponderance of the evidence." *Id.* (citing *Weaver v. State*, 855 S.W.2d 116, 120 (Tex. App.—Houston [14th Dist.] 1993, no pet.)). "To establish that the parties agreed to be husband and wife, it must be shown that they intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that may be ended by either party." *Id.* (citing *Eris*, 39 S.W.3d at 714).

### A.    Standard of Review

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Pettit v. Tabor*, No. 06-19-00002-CV, 2020 WL 216025, at *8 (Tex. App.—Texarkana Jan. 15, 2020, pet. denied) (mem. op.) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)). "We 'consider and weigh all of the evidence,' and we 'can set aside a verdict only if the evidence is so weak or if

the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.'" *Id.* (quoting *Dow Chem. Co.*, 46 S.W.3d at 242).

"[T]he fact-finder . . . determines the witnesses' credibility and the weight of their testimony." *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)). As a result, a jury "may believe all, part, or none of a witness' testimony." *Id.* (quoting *Antolik v. Antolik*, No. 06-18-00096-CV, 2019 WL 2119646, at \*3 (Tex. App.—Texarkana May 15, 2019, pet. denied) (mem. op.)). "In our review, we must credit evidence favorable to the finding if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not." *Id.* (quoting *Antolik*, 2019 WL 2119646, at \*3).

## B.     The Evidence at Trial

Summer testified that she met Martin in 2010 and moved into his home with her daughters in 2012. Summer said that she and Martin lived together continuously from June 2012 through March 2019, she considered herself to be Martin's wife, and she regarded Martin as her husband.

Summer testified that she and Martin had commemorated their marriage by a written agreement and explained the circumstances that lead to the agreement. Summer said that Billy Ray Martin, Sr. (Senior) became ill, that he required medical treatment, and that his doctor "wanted some kind of written paper . . . for [her] to be able to take [Senior] where he needed to go." As a result, in 2015, Summer testified that she "signed papers like in front of a notary as husband and wife because [Senior] came to live with [them]." According to Summer, the document, which she did not have a copy of, was signed at her counsel's office and "was just

4

basically stating the marriage." Summer testified that, even though she and Martin did not celebrate the marriage in a traditional sense and did not invite her family, they went to a neighbor's house and "cooked fish with [Senior]." Summer said she did not ask the neighbor to testify because they "d[id] not get along any more."

Summer said (1) that Martin gave her a ring in 2015, which symbolized the marriage, (2) that she wore that ring, and (3) that, even though she did not give Martin a ring, he used Senior's ring. Summer said that her last name was "Martin," "[o]n some documents," but admitted that she did not legally change her name and that neither her driver's license nor her social security card listed "Martin" as her last name. When Senior passed away, Summer said she represented herself to be Senior's daughter-in-law at the funeral home.

Summer testified that she separated from Martin in March 2019 because of his methamphetamine and alcohol use. At that time, Summer and her daughters moved in with Martin's neighbor and former friend, Jimmy Goodwin, who tried to give her an engagement ring. Summer admitted that she and Goodwin had sexual relations and that she still lived in a home on his property. Even so, Summer claimed that she was living with Martin again on November 29, 2019, the day of Martin's death.

Summer testified that she had invited people to celebrate Thanksgiving with her and Martin on the day of his death, but Martin, who was an avid fisherman and had taken his boat out that day, never made it to the Thanksgiving table. At 12:52 p.m., Martin's body was found floating in four feet of water. He was wearing a life jacket, shirt, socks, and boxers, but he was

5

not wearing pants, and his boat was never found. Summer testified that law enforcement officers tried to get in touch with her because they believed she was his wife.

Summer did not have a funeral for Martin. Days after his death, his home and shed, which was located fifty yards from the home, were consumed by fire. Summer testified that photos of her and Martin burned up and that, when she found the fireproof safe containing their 2015 signed marriage agreement, "there was no budging it."

Summer introduced the testimony of several witnesses in support of her claim, including Martin's mother, Jo Martin. Jo testified (1) that Martin and Summer "had [a] common law marriage," (2) that they both affirmed their marriage, and (3) that she considered Summer to be her daughter-in-law. Savannah Carlile, who saw Martin and Summer every six to eight weeks, testified that they lived together, called each other husband and wife, and appeared to be husband and wife. Cassie Rawlins, who had known both Martin and Summer for a long time, testified (1) that Martin called Summer his wife, (2) that Summer wore a wedding ring, and (3) that Summer and Martin "definitely" held themselves out as husband and wife. Chastity Childers, who had also known the couple for many years, testified, "[T]hey thought of each other as husband and wife." According to Childers, Martin referred to Summer as "[h]is old lady," and Summer's children "called [Martin] dad." Even so, Carlile testified that Summer moved in with Goodwin before Martin's death, and Rawlins said she knew Goodwin had asked Summer to marry him.

Jeffrey Johnson, the father of Summer's niece, testified that Summer moved in with Goodwin and remained there even though she had lived with Martin for many years. Johnson

6

testified that Martin did not show his feelings toward Summer until she had moved out but considered Summer to be his wife "[t]oward the end." According to Johnson, neither Martin nor Summer wore a wedding ring.

Summer testified that Martin's closest friends were Autumn Daniel and Toby Reynolds. Both testified that Martin was not married to Summer. Daniel testified that she had known Martin since 1995 and that Martin and Summer had not agreed to be married. According to Daniel, Summer lived in Martin's home but Martin "stayed in his man cave"—the shed—most of the time. Daniel said that Martin never claimed Summer as his wife and never wore a wedding ring. Daniel did not recall Summer ever having a wedding ring, and she did not hear about any celebration of an agreement to get married. Daniel testified that Summer was living with her boyfriend, Goodwin, when Martin died and only started using "Martin" as her last name after Martin's death. Daniel believed that Martin had a will, that Martin did not intend for Summer to inherit any of his estate, and that everything was to go to Travis "without a doubt."

Daniel's testimony was echoed by Reynolds, who knew Martin for twenty-two years, lived a block away, saw Martin several times a week, and was his best friend. Reynolds said that Martin and Summer dated but separated. According to Reynolds, while Summer cooked for Martin and cared for the house, she and Martin were not married. Reynolds testified that Martin (1) never said he made an agreement to marry Summer, (2) did not wear a wedding ring, (3) did not call Summer his wife, and (4) did not intend to be married.[3] Reynolds said that he would have noticed if Summer wore a wedding ring and that she never used the last name "Martin"

---

[3]The evidence showed that Reynolds was in jail from 2013 to 2015.

7

until after Martin died. According to Reynolds, Summer moved out nine months before Martin died and moved in with Goodwin, who gave Summer an engagement ring. Reynolds testified that Martin knew about the engagement ring and, two nights before his death, "was mad as a hornet, wanting to kill her . . . [b]ecause she was getting married to . . . [Goodwin]." Reynolds testified that Martin "wanted everything going to [Travis]."

Susan Crockett, who had known Martin since he was fourteen and visited him often, and Martin's stepbrother-in-law, Donald Jackson, also testified against the claim of common-law marriage. Crockett said that, while Martin loved Summer's children, she did not witness a loving relationship between him and Summer and did not believe they were married. Crockett and Jackson explained that Summer and her children stayed in Martin's main house while Martin stayed in his "man cave." Jackson added that Summer was always in the house and never came to the man cave where Martin entertained visitors. Jackson testified that Martin used to say that Summer "was embedded like a tick, and he couldn't get rid of her." According to Crockett and Jackson, who said they would have known if Martin intended to be married, Martin never introduced Summer as his wife and did not wear a wedding ring.[4] Jackson testified that Summer's last name was Barnwell but that she started going by "Martin" after Martin died.

Crockett testified that Martin was very proud of Travis and wanted him to have his entire estate. Jackson said he had spoken with Martin about his estate many times, that Martin never said he wanted anything to go to Summer, and that Martin wanted everything, including the

---

[4]Jackson said he did not hear others refer to Summer as Martin's wife.

house, to go to Travis. Jackson testified that their conversations led him to believe that Martin had a will.

Travis, who was twenty-two at the time of trial, was in the Navy and had given Stone a power of attorney to file an application for determination of heirship on his behalf. Travis and Kyle Bowden, COO and Senior Vice President of First National Bank of East Texas, testified that Martin had opened a bank account on July 15, 2019, which listed Travis as his sole beneficiary. Stone testified that his daughter, Beth Stone, was Travis's biological mother and that, even though Beth and Martin lived together for many years, they were never married.

The last witness was Wyone Manes, an Upshur County justice of the peace, who explained how Summer's name appeared on Martin's death certificate. Manes testified that "[t]he first part of [a] death certificate is done by the funeral home," which includes personal information such as whether the person is married. The same funeral home that held services for Senior's funeral checked a box on the death certificate indicating that Martin was married. When Manes received the death certificate containing the funeral home's representation of Martin's marital status, she filled out the information showing the circumstances of Martin's death and signed the certificate, even though it did not list the name of any spouse.

The day after she signed the certificate, a woman named Crystal Tombs visited Manes's office, claimed to be Martin's girlfriend, and presented Manes with Martin's notarized power of attorney showing that she lived with Martin. Although the power of attorney was no longer valid, it raised Manes's suspicions about Martin's marital status. Manes called the funeral home to demand proof of marriage. Although the funeral home, Summer's counsel, and Jo responded

9

that Summer was Martin's common-law wife, Manes was unsatisfied because she did not receive other proof of the common-law marriage. As a result, Manes testified that she did not believe Martin was married. Manes also testified that, because the funeral home certified Martin's personal information, only they could change Martin's marital status, but had refused to do so. Manes added that she would have altered the certificate to state that Martin was unmarried if she had had the ability to do so.

After weighing all the testimony, the jury found that Martin and Summer were not married.

### C. Analysis

Here, Summer bore the burden to prove, by a preponderance of the evidence, that (1) she and Martin agreed to be married, (2) she and Martin lived together in Texas as husband and wife after the agreement, and (3) she and Martin represented to others that they were married. In this case, the evidence relating to all three elements of common-law marriage was controverted.

While Summer introduced evidence that she and Martin agreed to be married, Martin's best friends, Reynolds and Daniel, contradicted that testimony. Although Summer claimed that she had signed an agreement of marriage at her counsel's office, no such agreement was produced, even though Summer had the safe securing the alleged agreement and knew she had the burden to prove her common-law-marriage claim. Also, the jury heard that Summer and Martin did not invite anyone to their marriage agreement celebration, and no one could corroborate Summer's testimony that a celebration occurred because Senior had passed and Summer was not speaking to the neighbor. "As the sole judge of the credibility of the witnesses,

10

the [jury] could reasonably disregard [Summer's] controverted testimony regarding her claim that [she and Martin] mutually agreed to be married." *Fusselman v. Fusselman*, No. 09-11-00435-CV, 2013 WL 5428137, at *3 (Tex. App.—Beaumont Sept. 26, 2013, no pet.) (mem. op.).

As for the second element, ample evidence showed that Summer and Martin lived together, but "[t]he cohabitation must be professedly as husband and wife . . . so that, by their conduct towards each other, they may be known as husband and wife." *Small v. McMaster*, 352 S.W.3d 280, 284 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Grigsby v. Reib*, 153 S.W. 1124, 1130 (Tex. 1913)). While Summer introduced evidence that the cohabitation was as husband and wife, other witnesses disagreed. The contradicting evidence established that, while Summer cooked for Martin and cleaned the home, Martin "stayed in his man cave," where he entertained guests outside of Summer's presence. Reynolds and Crockett testified that Martin never intended to be married. Crockett, Daniel, and Jackson said Martin never claimed Summer as his wife. Crockett told the jury she never saw a loving relationship between Martin and Summer, and Jackson said he never saw Martin and Summer interact as a couple. Because testimony showed that Summer moved into Goodwin's home, the jury could infer that Summer and Martin had a "cohabitation that [could] be ended by either party." *Burden*, 420 S.W.3d at 308. As the fact-finder, the jury was free to conclude that Summer and Martin did not live together as husband and wife.

Last, "[t]he element of representing to others that they were married, or 'holding out,' requires more than occasional references to each other as husband and wife." *Meshell v. Lippi*, No. 02-15-00212-CV, 2016 WL 2840877, at *2 (Tex. App.—Fort Worth May 12, 2016, no pet.)

(mem. op.) (citing *Smith v. Deneve*, 285 S.W.3d 904, 909–10 (Tex. App.—Dallas 2009, no pet.)); *see Est. of Walker*, No. 2-08-371-CV, 2009 WL 1996301, at *3 (Tex. App.—Fort Worth July 9, 2009, no pet.) (mem. op.) (citing *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at *1 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.) ("[I]solated references to each other as husband and wife alone do not establish a holding out[.]" (alterations in original)); *Flores v. Flores*, 847 S.W.2d 648, 653 (Tex. App.—Waco 1993, writ denied). Instead, "[w]hether the evidence is sufficient to establish that a couple held themselves out as husband and wife turns on whether the couple had a reputation in the community for being married." *Small*, 352 S.W.3d at 285 (citing *Eris*, 39 S.W.3d at 715; *Danna*, 2006 WL 785621, at *1 (a "couple's reputation in the community as being married is a significant factor in determining the holding[-]out element") (alteration in original)). In other words, "[p]roving a reputation for being married requires evidence that the couple 'consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married.'" *Id.* (quoting *Danna*, 2006 WL 785621, at *2).

Summer, Carlile, Rawlins, and Childers testified that Martin and Summer referred to each other as husband and wife, and Jo testified both that the couple affirmed their marriage and that she considered Summer to be her daughter-in-law. Summer and Rawlins also testified that Summer wore a wedding ring. Even so, Martin's closest friends said that Martin was not married and did not introduce or refer to Summer as his wife. When Summer moved in with Goodwin, Goodwin asked Summer to marry him, suggesting that he also believed Summer was unmarried even though he was Martin's neighbor. Summer admitted that she had never legally

12

changed her name, and several witnesses testified that she only started using the last name "Martin" after Martin died. From this conflicting evidence, the jury was free to conclude that the last element of common-law marriage was unmet.

In this case, the jury resolved the conflicting evidence by finding that Martin and Summer were not married. After reviewing all of the evidence, we cannot say that the jury's finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. As a result, we find the evidence factually sufficient to support the jury's finding, and we overrule Summer's first issue.

## II. The Trial Court Did Not Abuse Its Discretion by Admitting Manes's Testimony Over Summer's Sole Preserved Objection

In her second point of error, Summer argues that the trial court erred by admitting Manes's testimony because it "attempt[ed] to 'impeach' the statements on a certified death certificate." We disagree. We also find that Summer failed to preserve her remaining arguments to Manes's testimony, which claimed that, because the testimony constituted "opinions . . . based on her previous participation in this case," it was prohibited by the Code of Judicial Conduct. As a result, we overrule Summer's second point of error on appeal.

### A. Summer Failed to Preserve an Admissibility Issue Before Trial

"As a prerequisite to presenting a complaint for appellate review, the record must show that" it "was made to the trial court by a timely request, objection, or motion that . . . stated the grounds for the ruling . . . with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and that either the trial court "ruled on the request, objection, or motion, either expressly or implicitly," or "refused to

13

rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a).

Before trial, Summer moved to limit Manes's testimony on the ground that she should not "be allowed to come in and impeach" the death certificate. After the trial court said, "I'm going to deny that motion in limine," Summer requested "a limine instruction on that, under the circumstances." Summer clarified that she believed Manes was "not supposed to be able to testify, as a judge," and requested a limiting instruction, to which the trial court responded, "You bring it up or object."

"A motion in limine . . . does not preserve error on evidentiary rulings at trial because it does not seek a ruling on admissibility . . . ." *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 920 n.3 (Tex. 2015) (per curiam). Instead, "the purpose of such a motion 'is to prevent the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury' without seeking the trial court's permission." *Id.* (quoting *Hartford Accident & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex. 1963), *abrogated on other grounds by Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231 (Tex. 2007) (per curiam)); *see In re J.A.P.*, No. 06-08-00092-CV, 2009 WL 839953, at *1 (Tex. App.—Texarkana Apr. 1, 2009, no pet.) (mem. op.). Even liberally construing Summer's motion as an objection to the admissibility of Manes's testimony, we find error unpreserved because "[a] party is 'required to obtain an adverse ruling on their objection to preserve error for review,'" and the trial court neither ruled on the issue nor refused to rule. *See Est. of Pettit*, No. 06-22-00043-CV, 2023 WL 2319409, at *2 (Tex. App.—Texarkana Mar. 2, 2023, no pet. h.) (mem. op.) (quoting *Pilgrim's Pride Corp.*

14

*v. Smoak*, 134 S.W.3d 880, 896–97 (Tex. App.—Texarkana 2004, pet. denied)). Instead, Summer received a reminder to raise any complaints about Manes's testimony at trial.

**B.      The Trial Court Did Not Err by Overruling the Impeachment Argument, Which Was the Only Argument Preserved for Review**

Before Manes's testimony, Summer's counsel said, "Your Honor, I do have some law about amending a death certificate," to which the court replied, "Okay, that's fine. I want to hear what she's got to say, and I'll look at your law." Outside the jury's presence, Manes testified that the funeral home filled out Martin's marital status and would not change it and that she had no authority to change it herself. The trial court then had a brief hearing, in which the following occurred:

> THE COURT: . . . . [Y]ou had a case or something that the Judge over here can't testify about questions she had about the death certificate.
>
> [SUMMER'S COUNSEL]: No, I don't have a case that says she can't testify to questions. Here's my approach, Your Honor. My approach is that this is the death certificate, that it sets forth the facts that she found as of January 24th, 2020, when the State Registrar certificates [sic] this. And that there is a procedure for amendment if it should have been amended, if there should be any changes on it. And that that procedure has not been initiated by anyone.
>
> THE COURT: Okay. So? . . . . What does that have to do with the testimony that --
>
> [SUMMER'S COUNSEL]: Well, she's impeaching this death certificate is what she's doing.
>
> THE COURT: You can bring that out on cross examination.
>
> . . . .
>
> THE COURT: I'm going to admit her testimony.
>
> . . . .

15

THE COURT:  Now, however, [Summer's counsel] is going to be objecting, I assume --

[SUMMER'S COUNSEL]:  Yes.

THE COURT: -- while the Jury is in.  And so, Judge, whenever you get an objection, don't answer until I've had a chance to rule on it, because a question may be asked that I haven't heard asked yet.

At that point, the trial court was presented with and overruled an objection that Manes should not be allowed to impeach a death certificate.  "We review the trial court's decision to admit or exclude evidence for an abuse of discretion."  *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020) (per curiam).  "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'"  *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (alteration in original) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

Here, we find no abuse of discretion in the trial court's ruling.  Counsel's impeachment argument did not refer to any rule of admissibility.  Instead, counsel referred to a statute allowing amendment "to modify the medical certification information on the [death] certificate."  TEX. HEALTH & SAFETY CODE ANN. § 193.012.  Yet, a death certificate contains both personal and medical information.  TEX. HEALTH & SAFETY CODE ANN. § 193.004.  Because Section 192.012 only provides for amendments to medical information, nothing suggests it would preclude Manes's testimony about the personal information contained in the death certificate.  Moreover, since "[a] copy of a . . . death . . . record registered [under the Health and Safety Code] . . . that is certified by the state registrar is prima facie evidence of the facts stated in the record," not

16

conclusive evidence, it was subject to rebuttal. TEX. HEALTH & SAFETY CODE ANN. § 191.052; *see Marker v. Prudential Ins. Co. of Am.*, 273 F.2d 258, 264 (5th Cir. 1959) ("[F]indings in the original and the amended [death] certificate of suicide and accident were findings of fact, admissible as prima facie evidence only, and subject, under the controlling rules of evidence, to full explanation and contradiction.").[5] For these reasons, and because Summer's counsel cited no rule of admissibility that would preclude Manes's testimony, we find that the trial court did not act without reference to any guiding rules or principles in overruling counsel's objection.

### C. Summer Failed to Preserve any Other Complaint About Manes's Testimony

"[A] party must object at trial when the testimony is offered in order to preserve error for appellate review." *Zinda v. McCann St., Ltd.*, 178 S.W.3d 883, 894 (Tex. App.—Texarkana 2005, pet. denied). Manes testified, without objection, that "[t]he first part of the death certificate [was] done by the funeral home," which includes whether the person [was] married. When Manes said that she did not agree with the representation that Martin was married, the following occurred:

> [SUMMER'S COUNSEL]: Your Honor, excuse me. I need to interpose my objection at this point.
>
> THE COURT: Please proceed.
>
> [SUMMER'S COUNSEL]: Thank you. May I have a running objection from this point forward, Your Honor? And the basis is that --
>
> THE COURT: On what particular item do you want a running objection on?

---

[5]*See also Gaines v. Acme Indus. Life Ins. Soc.*, 155 So. 276, 277 (La. Ct. App. 1934) (allowing testimony of signatory doctor to impeach cause of death in death certificate).

[SUMMER'S COUNSEL]:  Well, I guess --

THE COURT:  Identify what you want to --

[SUMMER'S COUNSEL]:  Any testimony that relates to items 1 through 27, any indications that are on there.[6]

THE COURT:  Overruled.

[SUMMER'S COUNSEL]:  So may I have a running objection on that basis?

THE COURT:  Yes.

An objection must state the "grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."  TEX. R. APP. P. 33.1(a)(1)(A).  For this reason, "[a] running objection is required to be specific and unambiguous."  *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 203 (Tex. App.—Texarkana 2000, pet denied).  While Summer generally objected, she failed to state the basis for the objection.

To the extent that the trial court understood the objection to raise the same impeachment issue discussed just before Manes's testimony, we have already found that it did not abuse its discretion by overruling it.  To the extent Summer intended to raise a different objection, we find it unpreserved for lack of specificity.

In her brief, Summer argues that Manes's "opinions . . . based on her previous participation in this case" were prohibited by the Code of Judicial Conduct.  However, "a party's complaint on appeal must comport with the objection made at trial," and the record shows that

---

[6]In large part, items 1 through 27 referred to the personal information on Martin's death certificate.

no such objection occurred during Manes's testimony. *Great N. Energy, Inc. v. Circle Ridge Prod., Inc.*, 528 S.W.3d 644, 673 (Tex. App.—Texarkana 2017, pet. denied) (quoting *Lee v. Holoubek*, No. 06-15-00041-CV, 2016 WL 2609294, at *5 (Tex. App.—Texarkana May 6, 2016, no pet.) (mem. op.)). While Summer's remaining complaints were raised in a motion for a new trial, they were untimely since Manes's testimony had already been admitted in front of the jury. *See In re G.B.*, No. 06-20-00031-CV, 2020 WL 4589761, at *3 (Tex. App.—Texarkana Aug. 11, 2020, no pet.) (mem. op.) ("An objection made after the testimony has been elicited is untimely and does not preserve the complaint for appellate review."); *Knoderer v. State Farm Lloyds*, 515 S.W.3d 21, 44–45 (Tex. App.—Texarkana 2017, pets. denied) (an objection to exclude testimony after it is concluded is untimely); *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 69 (Tex. App.—Texarkana 2000, no pet.) ("We have found no instance where a claim of error is preserved when a party waits until the witness completes her testimony . . . and then asks the court on the next day to strike the testimony."). We overrule Summer's remaining complaints to Manes's testimony because she failed to preserve them.

### III.    Summer Failed to Preserve Her Remaining Complaints

Summer argues that Reynolds's testimony that Martin wished to leave everything to Travis was improper and that the trial court erred by admitting Jackson's and Daniel's testimony that Martin had a will that distributed his assets to Travis. We conclude that none of those complaints are properly preserved.

Reynolds testified, without objection, that "[Martin] wanted everything going to [Travis]." Also, without objection, Jackson testified that Martin "had mentioned a [w]ill," said

he wanted "anything he had . . . to go to his son," and never said he wanted anything to go to Summer. Although he had not seen the will, Jackson testified, without objection, that he believed Martin had one.

"Preservation of error is a systemic requirement on appeal." *Knoderer*, 515 S.W.3d at 44. "If an issue has not been preserved for appeal, we should not address it on the merits." *Id.* Because Summer failed to make a contemporaneous objection to Reynolds's and Jackson's testimony, she has not preserved her complaints to their testimony.[7]

Daniel also testified, without objection, that Martin had a will. When asked, "Do you know what that [w]ill left," Summer's counsel lodged hearsay and speculation objections. The trial court held a brief hearing outside the jury's presence, in which counsel questioned Daniel about how she knew of Martin's will. The trial court made no ruling on the objections. Instead, Summer's counsel ended the hearing by saying, "Your Honor, I probably want to make a very explicit objection to any further testimony on this," to which the trial court responded, "When the question is asked, go ahead and make your objection."

Summer's counsel objected to the initial question directed to Daniel and secured an adverse ruling. Even so, generally, a party "must object to the evidence every time it is offered, or the objection is not preserved." *Est. of Emmons*, No. 06-17-00007-CV, 2017 WL 3908624, at *3 (Tex. App.—Texarkana Sept. 7, 2017, no pet.) (mem. op.). An exception to the rule occurs when a party secures a running objection. *Id.*; *see In re A.D.K.*, No. 06-19-00019-CV, 2019 WL 2607599, at *7 (Tex. App.—Texarkana June 26, 2019, pet. denied) (mem. op.) (citing

---

[7]Summer argues that she raised these complaints in her motion for a new trial, but we find them untimely. *See In re G.B.*, 2020 WL 4589761, at *3; *Knoderer*, 515 S.W.3d at 44–45; *Aluminum Chems. (Bolivia), Inc.*, 28 S.W.3d at 69.

20

*Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004)).  Here, Summer sought, but failed to secure, a running objection to the remainder of Daniel's testimony.  As a result, when Summer's own counsel elicited Daniel's testimony that she heard Martin speak about a will, the testimony was admitted without objection. Also, Summer's counsel failed to object to Daniel's direct testimony that Martin wanted to leave everything to Travis "without a doubt."  As a result, Summer failed to preserve her complaints about Daniel's testimony.

We conclude that Summer did not preserve her remaining substantive complaints on appeal and overrule them.

## IV.     Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:     April 5, 2023
Date Decided:       May 2, 2023

21